**Lynda DUNAWAY, Appellant,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Appellee.**

**No. 01–7122.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 2002.

Decided Nov. 15, 2002.

Steven G. Polin argued the cause and filed the brief for appellant.

James A. McCall argued the cause for appellee. On the brief was Nicole R. Pollard.

Before: SENTELLE, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Lynda Dunaway appeals the grant of summary judgment on her claim of unlawful termination from employment on the grounds that the district court erred in ruling that she failed to establish a prima facie case of discrimination based on gender, national origin, or age, and that she failed to show that she was a permanent employee, rather than an at-will employee, by virtue of an implied contract with the International Brotherhood of Teamsters ("Teamsters"). Because the record indi-

cates that there are genuine issues of material fact regarding whether Dunaway was discharged because of gender or national origin, we reverse and remand for trial on those claims; otherwise we affirm.

## I.

Dunaway, an Asian–American woman, worked for the Teamsters for twenty-five years. Between 1971 and 1987, she performed sufficiently well to merit a salary increase and a promotion, over James Bosley, to the position of Payroll Supervisor. Dunaway had a perfect employment record in that position through 1992. In 1992, union elections were held, and Thomas Sever became the new General Secretary–Treasurer of the Teamsters. He appointed Bosley director of the newly merged Accounting and Payroll Departments, which made Bosley Dunaway's immediate supervisor as of February 1992. In 1993, Bosley gave Dunaway her first negative work evaluation in twenty-two years of working for the Teamsters.

By memorandum of August 19, 1993, Bosley informed Dunaway that she needed to improve her performance with respect to timely payment of both employee health and welfare insurance premiums and domestic and Canadian payroll taxes. From time to time through October 1994, Dunaway received other memoranda from Bosley stating that he considered her work performance unacceptable, again citing her tardiness in making health and welfare insurance payments as well as her delayed reply to his previous queries about tax levies and failure to meet with a designated computer specialist about implementing a new human resources software program. By Bosley's own admission, these problems were all rectified or explained to his satisfaction. Dunaway did not receive any negative performance evaluations after October 1994.

Then, in January 1997, without prior notice, Bosley asked Dunaway to submit her resignation because the Teamsters planned to take the Payroll Department in a new direction and wanted to make personnel changes. When she declined to resign, Bosley told her she was terminated from employment, effective immediately. Dunaway filed a complaint in June 1997 with the Equal Employment Opportunity Commission.

In June 1998, Dunaway sued the Teamsters for gender and national origin discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; age discrimination in employment under both the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, and the Human Rights Act of the District of Columbia, D.C.Code § 2–1402.01 *et seq.*; and breach of implied contract. The Teamsters filed an answer and discovery followed. Thereafter, the Teamsters filed a motion for summary judgment, which Dunaway opposed.

The district court granted summary judgment for the Teamsters. The court found that Dunaway had not established a prima facie case of discrimination because she had failed to show that she was qualified for the position of Payroll Supervisor in light of "uncontroverted evidence that shows that ... [she] was not meeting her employer's expectations." The court also found that because Dunaway failed to show a connection between "alleged stray remarks relating to [her] protected characteristic[s]" and the decision to terminate her employment, the evidence was "not probative of the fact that Dunaway had been discharged because of her national origin." Upon reviewing the Teamsters' Retirement and Family Protection Plan ("Retirement Plan"), Local 2 Collective Bargaining Agreement ("Local 2's Agreement"), Teamsters' Confidentiality Agree-

ment, and an Accounting Department personnel manual, the court further found that Dunaway failed to present sufficient evidence to establish an implied contract for employment of any duration.

## II.

On appeal from the grant of summary judgment, our review is *de novo,* and we apply the same standards as the district court. *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If factual issues can "reasonably be resolved in favor of either party," there is a need for a trial. *Id.* at 250, 106 S.Ct. at 2511. The court, therefore, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000); *cf. Waterhouse v. Dist. of Columbia,* 298 F.3d 989, 992 (D.C.Cir.2002), viewing the evidence in the light most favorable to the non-moving party and according that party the benefit of all reasonable inferences. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)); *cf.* Fed. R.Civ.P. 50. *See also Reeves,* 530 U.S. at 150, 120 S.Ct. at 2110; *Waterhouse,* 298 F.3d at 991; *Forman v. Small,* 271 F.3d 285, 291 (D.C.Cir.2001). At this stage of the proceedings, the court is not to make credibility determinations or weigh the evi-

dence. *Reeves,* 530 U.S. at 150, 120 S.Ct. at 2110. Only if, after examining the evidence, the court finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," is summary judgment appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Jackson v. Finnegan,* 101 F.3d 145, 150 (D.C.Cir.1996).

## A.

When reviewing discrimination claims in which the plaintiff alleges that a discriminatory motive was the only basis for the employer's action, the court employs the *McDonnell Douglas* burden-shifting scheme, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as refined in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), *Texas Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *Reeves,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105. *See Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284 (D.C.Cir.1998) (en banc); *cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), superseded in part by 42 U.S.C. § 2000e-2(m). The *McDonnell Douglas* framework establishes an order for the presentation of proof in discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. *Reeves,* 530 U.S. at 142, 120 S.Ct. at 2105–06; *Aka,* 156 F.3d at 1288. Once the plaintiff has done so, the burden of production shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the challenged employment decision. *Id.* If the employer presents such reasons, then the burden shifts back to the plaintiff, who is "afforded the 'opportunity to prove by a prepon-

derance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); *see also Aka,* 156 F.3d at 1288–89. Although the "presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case, 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106 (citing *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749, and *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10).

Following instruction of the Supreme Court in *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), our analysis begins with the assumption that Dunaway presented a prima facie case of discrimination based on gender, national origin, and age. *See also Waterhouse,* 298 F.3d at 993; *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1554 (D.C.Cir.1997). In *Aikens,* the Court, in reviewing a judgment following a full trial on a Title VII claim of racial discrimination in the failure to promote, expressed surprise that the parties were still addressing whether the plaintiff had made out a prima facie case. *Id.* at 714, 103 S.Ct. at 1481. By framing the issue in those terms, the Court was of the view that the parties "unnecessarily evaded the ultimate question of discrimination *vel non.*" *Id.* Rejecting the view that the prima facie case method established in *McDonnell Douglas* was intended to be "rigid, mechanized, or ritualistic," the Court observed that once the defendant "has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant" because "[t]he district court has before it

all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'" *Id.* at 715, 103 S.Ct. at 1481 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978), and *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94). Accordingly, because the defendant in *Aikens* offered evidence to explain why the plaintiff was not promoted, the Court instructed that at the close of all the evidence, the district court should have directly addressed whether the employer had discriminated against Aikens because of his race. *Id.* Notably, in *Aikens* it was undisputed that the plaintiff was a member of a protected class (racial minority) and had applied for promotions for which he was at least minimally qualified and for which the defendant-employer had selected a non-minority applicant. *Id.* at 713, 103 S.Ct. at 1480–81.

Similarly, here, the Teamsters presented its full defense to Dunaway's claims when it moved for summary judgment and attached a Statement of Material Facts Not in Dispute, with affidavits and other exhibits intended to demonstrate a nondiscriminatory reason for termination of her employment. *See* Fed.R.Civ.P. 56; D.D.C. Local Civ. Rule 7.1(h). Dunaway, in turn, responded with an opposition to the motion, filing a Statement of Material Facts in Genuine Dispute as well as her deposition testimony and that of others. It is undisputed that Dunaway is a member of a protected class for purposes of her discrimination claims: she is female, of Asian descent, and was more than forty years of age when the Teamsters terminated her employment. She was not required to prove that she was replaced by a person outside of the protected class. *See Stella v. Mineta,* 284 F.3d 135, 146 (D.C.Cir. 2002); *Lewis v. NVT Techs., Inc.,* 118 F.Supp.2d 51, 53 (D.D.C.2000); *cf. O'Connor v. Consol. Coin Caterers Corp.,* 517

U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). As in *Aikens,* the proper question now is whether the employer unlawfully discriminated against the plaintiff. 460 U.S. at 715, 103 S.Ct. at 1481–82.

In a discrimination case, the question is "whether a reasonable jury could have found such intentional discrimination." *McGill v. Munoz,* 203 F.3d 843, 846 (D.C.Cir.2000). The plaintiff may meet her burden of proof by either direct or circumstantial evidence. In *Aikens,* the Supreme Court reversed affirmance of the district court's judgment after trial in part because the district court had "erroneously thought that [the plaintiff] was required to submit direct evidence of discriminatory intent," 460 U.S. at 717, 103 S.Ct. at 1483. The Court reiterated that in Title VII cases, "[a]s in any lawsuit, the plaintiff may prove h[er] case by direct or circumstantial evidence." *Id.* at 714 n. 3, 103 S.Ct. at 1481 n. 3; *see also Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). Thus, Dunaway may meet her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Ultimately, the question is "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Waterhouse,* 298 F.3d at 993 (citing *Aka,* 156 F.3d at 1289).

## B.

■ In opposing summary judgment, Dunaway proffered, as part of her Statement of Material Facts in Genuine Dispute, evidence that responded to each of the Teamsters' five purported reasons for terminating her:

Failure to follow office protocol. The Teamsters state in its Statement of Material Facts Not in Dispute that Dunaway failed to follow office protocol. Both parties agree that in 1993, Bosley instituted a new chain of command that required Dunaway to show him all letters sent by her section, not contact any employees without his knowledge, and notify him every time someone outside her section contacted her. Dunaway states in her deposition that she did follow this chain of command, and Bosley admits in his deposition that after he made her aware of the policy, she followed it.

Late tax payments. The Teamsters also state that it repeatedly incurred penalties and levies as the result of Dunaway's failure to pay withholding taxes, both U.S. and Canadian, in a timely fashion. Dunaway counters that the late payments were caused by a number of factors over which she had no control. First, she states in her deposition that delays in Accounts Payable created delays outside of her department. She further states that, in an attempt to resolve the problem, she met with the manager of Accounts Payable, Louie Blyden, and then-Manager of the Accounting Department, Joseph Selsavage. Second, Dunaway states that the late U.S. payments and subsequent tax levies referenced by the Teamsters are for the years 1993–1994, the same period in which the payroll department implemented a new computer system, Oracle. She states that she tried to get training for the new system, but that the person in charge of her training was never available. Third, citing

Bosley's deposition, Dunaway states that even after management initiated a pre-audit to eliminate the tax problem, and after Dunaway was terminated, the problem of late taxes continued. Fourth, Dunaway states, in her deposition and also citing Bosley's deposition, that although she wanted to use overnight mail to avoid late Canadian tax payments, Bosley and Selsavage wanted to avoid the extra cost. It was not until May 1996 that Selsavage approved overnight mailing. Fifth, Robert Wilson, who served as Sever's Executive Assistant from February 1992 to October 1995, stated in his deposition that many of the tax penalties were abated by the Internal Revenue Service upon presentation by Dunaway of appropriate documentation or legitimate reasons for the late payments.

Failure to pay premiums for health and welfare coverage. The Teamsters further state that Dunaway failed to make timely payments of health and welfare premiums, endangering the coverage of the company's 500 employees. Dunaway, citing her deposition and that of Wilson, responds that the premiums could not be paid until the Department of Human Resources provided the necessary information to her department, and that because the chain of command then required her to turn the information over to Bosley, she had to wait for his often-tardy response in forwarding the information back to her. Dunaway, citing Bosley's deposition, also states that there were no late payments of health and welfare premiums after September 1993.

Failure to pay election dues in timely fashion. The Teamsters state that in 1996 Dunaway failed to remit in a timely manner the election dues for then-President Ron Carey. She made a double payment the next month to correct her error, but this raised the suspicion of the officers supervising the election, and resulted in an investigation. Dunaway, citing Bosley's deposition, responds that Carey was able to run in the election, and that at the time, no one, including Carey, thought that she should face adverse consequences as a result of her mistake.

Inability to work with other departments and people. The Teamsters also state that Bosley and Selsavage received complaints from other departments and employees concerning delays associated with requests made to Dunaway, as well as her rudeness and uncooperativeness. The Teamsters proffered declarations by five employees, not including Bosley and Selsavage, who say they experienced delays and rudeness with Dunaway. Dunaway counters in her deposition that she was never made aware of these complaints against her. She also notes that one of the employees acknowledges in his affidavit that he cannot recall any specific instances of problems with Dunaway, and points to Wilson's deposition testimony that another employee was biased against Dunaway's gender and national origin.

Dunaway also proffered evidence on animus and pretext with regard to comments about her national origin and gender, and comments directly related to the termination of her employment. In addition to her own testimony, Dunaway proffered Wilson's deposition as corroborating evidence that she was not fired for being a poor employee but because Bosley harbored an intense dislike for her because she was an Asian and a woman, and for those reasons often exaggerated the nature of incidents involving her. Wilson's deposition and declaration would support findings of fact that:

National origin-related comments. Bosley would refer to Dunaway as his "China doll," called Dunaway and an auditor from Vietnam, "Little Gook," and questioned Dunaway about whether she was born in the United States. Bosley would

talk to Dunaway "like something out of a Charlie Chan movie" and use expressions like "chop chop." Bosley also treated Dunaway differently than the Caucasian women who worked in her office. Sever did not think non-Americans should work for a union or that Dunaway should have the job because she was Asian.

Gender-related comments. Sever stated that women do not belong in the workplace, and that "they should either be on their backs or on their knees scrubbing floors." Sever said women do not have the mental capacities to handle professional situations like men. Bosley referred to all women as "Sylvia," but did not call all men by one name. When Dunaway was dressed in a tight shirt or short skirt, Bosley would create an excuse for her to go to Sever's office so that they could ogle her. Bosley once stood up after she left, grabbed his crotch, and said "This is what she needs." Bosley would take off his belt and snap it, while making comments like "no checkie, no wash." Sever was also upset that Judy Scott was an executive assistant because she was a woman, and "should be home having children, watching her kids." Sever further said that he thought Bosley should have been promoted to Payroll Supervisor over Dunaway because she was a woman.

Comments directly related to terminating Dunaway's employment. Bosley said, "This goddamn Oriental bitch got the job over me. I want to get rid of her." Bosley told Sever he wanted to "get rid" of Dunaway because she was a woman. Bosley expressed desire to terminate Dunaway because she was Asian. Bosley said to Wilson: "I think I got something on the China doll, something legitimate on the China doll."

In granting summary judgment for the Teamsters, the district court ruled that Dunaway's pre–1993 job performance was irrelevant in view of "uncontroverted evidence" that she was unqualified for her position and that complaints about her job performance continued. This ruling is inconsistent with viewing the evidence most favorably to Dunaway, as it ignores, for example, her proffered evidence of systemic explanations to explain payment delays. The court also found that the derogatory national origin and gender comments made by Bosley and Sever were "stray remarks," which the court defined as remarks "made outside the context of the challenged decision," and thus were not probative evidence that Dunaway was fired for discriminatory reasons. This finding ignores the four derogatory remarks about her national origin and sex that were directly connected to the Teamsters' desire to terminate Dunaway's employment. The credibility of her witnesses and the weight of her evidence are not matters to be considered at this stage of the proceedings. *Reeves,* 530 U.S. at 150, 120 S.Ct. at 2110.

We hold that Dunaway produced sufficient evidence to entitle her to present her claims to a jury. Viewing the evidence in the light most favorable to the non-moving party, Dunaway presented sufficient evidence from which a reasonable jury could find under the standards set out in *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6, and *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1512 (D.C.Cir.1995), that she was performing at or near her employer's reasonable expectations. During twenty-five years of service, her only formal unsatisfactory performance evaluation occurred in 1993, after Bosley became her supervisor. Dunaway proffered evidence that Bosley's negative evaluations of her work were less the result of her job performance than of Bosley's intense dislike for her because of her gender and national origin. In addition, Dunaway presented evidence, including derogatory statements about her gender and

national origin that were made in connection with termination of her employment, from which a reasonable jury could find that the purported explanations for her termination were pretextual. Her evidence would permit a reasonable jury to find that the Teamsters terminated her employment because of either her national origin or gender, and that the Teamsters' explanation is unworthy of credence. *See Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482.

### C.

By contrast, the district court could appropriately grant summary judgment on Dunaway's breach of contract and age discrimination claims. As evidence of an implied contract, Dunaway points to oral assurances made by Teamsters' officials at the time she was hired and several Teamsters' policies and manuals. According to Dunaway, when she was hired, after she passed a probationary period of employment, she expected that she would remain employed at the Teamsters until retirement, because as then-General Secretary-Treasurer Thomas Flynn told her, the Teamsters was a good place to work and took care of its employees. Dunaway further states that Judy Scott, then-Executive Assistant to the General President, told Dunaway that she was covered under the Teamsters' Retirement Plan and Local 2's Agreement. In addition, Dunaway points to the manuals setting forth the Retirement Plan, Local 2's Agreement, and the personnel policies for the Accounting Department, as well as a confidentiality agreement she signed and an anti-discrimination policy.

■ In the District of Columbia, employment contracts for no definite period of time are terminable at the will of either party absent clear evidence of the parties' intent to contract otherwise. *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1001 (D.C.Cir.1996); *Minihan v. Am.*

*Pharm. Ass'n*, 812 F.2d 726, 727 (D.C.Cir. 1987); *Hodge v. Evans Fin. Corp.*, 707 F.2d 1566, 1569 (D.C.Cir.1983); *Sullivan v. Heritage Found.*, 399 A.2d 856, 860 (D.C.1979). Although the oral assurances relied on by Dunaway are insufficiently precise to raise a genuine issue regarding the Teamsters' intent upon employing her, *see Willoughby*, 100 F.3d at 1001; *Minihan*, 812 F.2d at 727–28, it is well established that material issues of fact exist as to whether an employment manual and related materials between a former employee and a former employer create a contract. *See U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C.Cir. 1998); *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813 (D.C.1991); *Washington Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613 (D.C.1985).

■ Dunaway, however, cannot rest her implied contract claim on the Retirement Plan, which expressly states that it shall not be construed as giving any member in the Retirement Plan "the right to be retained in the employ of the [Teamsters], and all employees shall remain subject to discharge ... to the same extent as if the [Retirement] Plan had never been executed." The other manuals and policies to which she points also provide no evidence from which a reasonable jury could find an implied contract of permanent employment. Dunaway did not proffer evidence that she was told that she could rely on Local 2's Agreement with regard to termination from employment. To the contrary, she admitted in her deposition that as Payroll Supervisor she was not covered by Local 2's Agreement and that sometime after 1992 she was told by Scott that non-bargaining employees would be covered by a separate benefits document. Nor did she offer evidence to show that the personnel manual drew a distinction between probationary and permanent employees or set

preconditions to termination, and thus was the type of manual that could rebut the at-will presumption. *See Nickens,* 600 A.2d at 817–18; *Wheeler,* 496 A.2d at 615–16. Likewise, she failed to offer any evidence that the confidentiality agreement or the anti-discrimination policy included language clearly showing that the Teamsters intended it to confer contractual rights regarding employment. Taken together, the oral representations and various manuals and policies fail to constitute evidence that she had an implied contract of permanent employment as would entitle her to certain rights prior to being terminated.

 Dunaway's age-discrimination claim fares no better, for she failed to proffer evidence from which a reasonable jury could find that she was discriminated against on the basis of age, in violation of the ADEA and the D.C. Human Rights Act, when she was replaced by a woman who was seven years her junior. The Teamsters' decision to replace her with a younger woman is insufficient for a jury to conclude that she "lost out *because of [her] age,*" *O'Connor,* 517 U.S. at 312, 116 S.Ct. at 1310; *Adkins v. Safeway Inc.,* 985 F.2d 1101, 1104 (D.C.Cir.1993); *Cuddy v. Carmen,* 694 F.2d 853, 857–58 (D.C.Cir.1982). Dunaway proffered no other evidence that she was terminated because of her age and, to the contrary, her Statement of Material Facts insisted that the only reason she was fired was that she was an Asian woman. Moreover, to the extent that she links her age discrimination claim to the fact that she was only five years away from retirement and claims that the Teamsters were trying to avoid paying her retirement benefits, *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), is dispositive. The Court in *Hazen* observed that "an employee's age is analytically distinct from his years of service," and held that "an employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service," *id.* at 613, 113 S.Ct. at 1707–08.

Accordingly, because a reasonable jury could find by a preponderance of the evidence in Dunaway's favor on her gender and national origin claims, we reverse the grant of summary judgment and remand the case for trial on those claims. In all other respects, we affirm the grant of summary judgment to the Teamsters because Dunaway's contract and age discrimination claims fail either as a matter of law or on evidentiary grounds.