# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2005          Decided May 17, 2005

No. 03-5356

DIANE N. GEORGE,
APPELLANT

v.

MICHAEL O. LEAVITT, ADMINISTRATOR, EPA,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00654)

———

*Suzanne M. Tsintolas* argued the cause and filed the brief for appellant.

*Heather Graham-Oliver*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: EDWARDS, HENDERSON, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Following her discharge from the Environmental Protection Agency ("EPA"), appellant Diane N. George brought suit in the District Court, claiming violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (2000). Specifically, George claimed that she had been subject to a hostile work environment, that her discharge was the result of discrimination on the basis of race, sex, and national origin, and that she was retaliated against for engaging in activities that were protected under Title VII. The District Court granted summary judgment in favor of EPA on all counts. *See George v. Horinko*, Civ. A. No. 01-00654 (D.D.C. Oct. 16, 2003), *reprinted in* Joint Appendix ("J.A.") 570.

We affirm the judgment against George on her retaliation and hostile work environment claims, but we reverse the judgment in favor of EPA on the discrimination claims. On the record at hand, George has proffered evidence by which a reasonable jury could conclude that EPA's stated reasons for her discharge are a pretext for discrimination. Accordingly, she has created a genuine dispute over the validity of the reasons given for her discharge, precluding summary judgment. The case will therefore be remanded to the District Court for further proceedings consistent with this opinion.

## I. BACKGROUND

Diane George is a black woman originally from Trinidad and Tobago. An engineer by training, she was hired by EPA on September 14, 1998, subject to a one-year probationary period, to work as an environmental specialist in EPA's Office of the Asbestos and Small Business Ombudsman ("OASBO"). George was fired on March 26, 1999.

During the six months that George worked at EPA, Karen Brown, the Asbestos and Small Business Ombudsman, was George's team leader and had direct day-to-day supervisory

responsibility over George. Brown, however, was not officially classified as a manager; rather, Tom Kelly, the director of EPA's Office of Regulatory Management and Information, was the manager of record for both George and Brown. Although Brown interviewed George and recommended that she be hired, it was Kelly who officially hired and fired George.

In addition to George and Brown (a black woman), the OASBO during George's tenure consisted of a deputy ombudsman (a white man), four clerical or administrative employees (all black women), a computer specialist (a black man), and four professional engineers (all white men). With the exception of George and an engineer who originally was from Great Britain, all of the employees were from the United States. George was the only probationary employee in the unit, but seven of the other employees, including all four engineers, were employed not as federal civil servants but rather on a contract basis under EPA's Senior Environmental Employment Program.

According to George, she and her co-workers had several confrontations in December 1998 and January 1999 when her co-workers made insulting and demeaning statements to her. On different occasions, she was told by three separate employees to "go back to Trinidad" or to "go back to where [she] came from." On these and other occasions, her co-workers shouted at her, told her that she should never have been hired, and told her to "shut up." George reported each of these incidents to Brown, but Brown blamed George for causing the incidents and did not take any action.

George also maintains that she was assigned to various clerical duties that the white male engineers were never required to perform. In December 1998 and again in January 1999, George met with staff in EPA's Office of Human Resources to complain about her treatment and to seek advice. George was told to consider a transfer to another office or take her

complaints to the director of the human resources office, but no further investigation or action appears to have been taken.

On January 27, 1999, Brown and Kelly conducted a review of George's job performance. During the course of the evaluation, neither Brown nor Kelly raised any concerns about George's work or conduct. The supervisors' written evaluation gave George a "Successful" rating and observed that her work "shows considerable thought, insight and creativeness" and "require[s] no more than minor revisions"; that she "[w]orks effectively with office staff"; that she "routinely" meets her deadlines; and that she "[k]eeps pace with most new emerging external EPA issues and activities affecting office roles and responsibilities." Brown and Kelly maintain, however, that Brown advised Kelly before the performance review that Brown wanted to overlook any problems that George may have had in order to send her an encouraging message.

According to Brown, in the weeks following George's evaluation, George had a number of confrontations with her co-workers, including one incident when George was rude to an employee in the EPA mailroom, causing the employee's supervisor to lodge a complaint with OASBO, and another incident when George appeared rude after Brown asked her to cover a meeting. In mid-February, following these incidents, Brown met with Carolyn Johnson, the director of the Office of Human Resources, to seek advice on terminating "a probationary employee."

At around the same time, George returned to the Office of Human Resources to complain about Brown and what George perceived to be discriminatory treatment. George eventually met with Johnson, who advised George to take her complaints to EPA's Office of Civil Rights. George was provided information on her rights, including procedures for filing complaints of discrimination.

A few days later, Brown held a staff meeting with the OASBO clerical staff. Brown told the employees at the meeting that George was "causing problems" and instructed them to "keep [their] distance" from her. Brown also told the staff that she wanted a witness to be present whenever she and George met. And, on at least one occasion, an employee was asked to witness a conversation between Brown and George to ensure that "there couldn't be any call of harassment."

On February 23, Brown met with George to discuss some complaints regarding George's transcription of phone messages from an office answering machine ("the Hotline"). George denied that she had made any mistakes. Brown thought that George was insubordinate during the meeting, challenging Brown's authority. George, on the other hand, maintains that, without provocation, Brown "suddenly lost control" during the meeting.

The next day, Brown advised George that her employment was "not working out" and that she intended to raise the matter with Kelly. Brown met with Kelly that same day and recommended that George be fired. Kelly took Brown's recommendation under advisement, but made it clear that he would not simply accept Brown's account of the facts, but "was going to find out [for himself] what was going on."

On February 26, George went to the Office of Civil Rights to discuss the filing of a discrimination complaint against Brown and the agency. She also scheduled a private meeting with Kelly for March 1. At that meeting, George voiced her complaints to Kelly, expressing concern that she was a victim of discrimination and harassment. At the conclusion of the meeting, Kelly told George that he took her complaints seriously and would look into the situation. Kelly subsequently spoke with Brown about George's charges. Brown told Kelly that, in her view, George was to blame for provoking her co-workers.

On March 2, according to George, Brown came into George's office and, on her way out, violently and angrily kicked a box that she stumbled over. Noticeably shaken by this incident, George met with Kelly to inform him of the incident. George told Kelly that she was "fed up with the harassment" and was going to file a complaint with the Office of Civil Rights.

After his meeting with George, Kelly spoke with Brown about George's allegations. Brown denied that she had violently kicked a box, maintaining that she had merely stumbled over it and moved it out of the way with her foot. Brown told Kelly that another OASBO employee, James Malcolm, had witnessed the event.

Kelly claims that he then spoke with Malcolm. According to Kelly, Malcolm corroborated Brown's account of the incident, and also volunteered various problems he had in working with George. Malcolm does not remember speaking to Kelly about George, but states that, if he did, he would have corroborated Brown's account about the box-kicking incident. He maintains, however, that he "[a]bsolutely" never complained about George to Kelly. For her part, George maintains that Malcolm witnessed an entirely different incident when Brown stumbled over a box, not the incident in question when Brown violently kicked a box.

Kelly states that, after his conversations with Brown and Malcolm, he concluded that George was lying about the box-kicking incident. At this point, still on March 2, Kelly concluded that George was unreliable and, his earlier decision to conduct a full investigation of the facts notwithstanding, he decided to accept Brown's recommendation and fire George.

Kelly claims that he continued his investigation on March 3 when he spoke with another OASBO employee, Arnold Medbery. Kelly knew from Brown that there had been a "great deal of dissatisfaction" with George's transcription of Hotline

messages. George had told Kelly that she had received inadequate training on Hotline work and on other tasks that she was required to perform. Kelly found these claims "incredible" and wanted to speak with Medbery about the matter. According to Kelly, Medbery said that George was lying if she had claimed that she had not received training on transcribing Hotline messages. Medbery, for his part, firmly denies that such a conversation with Kelly ever took place. In any event, there is nothing in the record to suggest how any conversation Kelly had with Medbery on March 3 might have factored into Kelly's decision to fire George, which Kelly claims he made on March 2.

On March 3, George filed a claim of discrimination with the Office of Civil Rights. The next day, Kelly notified George by memorandum of her discharge, citing five reasons: (1) inability to organize work, analyze and present information, and demonstrate satisfactory initiative; (2) poor judgment leading to unacceptable relationships with her peers; (3) inability to accept coaching and supervision; (4) failure to contribute substantively in group settings; and (5) making material misrepresentations to her supervisor. George was immediately placed on paid administrative leave, where she remained until her separation from employment on March 26, 1999.

George unsuccessfully challenged her termination in a whistleblower retaliation action before the Merit Systems Protection Board before filing claims with the Equal Employment Opportunity Commission for discrimination and retaliation. After those claims were rejected, George filed the instant Title VII action, claiming unlawful discrimination based on race, sex, and national origin; a hostile work environment; and retaliation. On October 16, 2003, the District Court granted summary judgment in favor of EPA on all counts and this appeal followed.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* a district court's decision to grant summary judgment. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Summary judgment is proper only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Supreme Court has made it clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. *Id.* at 255. Thus, when reviewing a motion for summary judgment, a court must view all of the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Kaempe*, 367 F.3d at 965.

### B. *The Discrimination Claims*

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although this provision does not apply to federal agencies, *see id.* § 2000e(b) (defining "employer"), Title VII contains a separate provision that does. *See id.* § 2000e-16(a) ("All personnel actions

affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."). Despite the differences in language between the two provisions, we have held that "Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers, and so we may construe the latter provision in terms of the former." *Singletary v. Dist. of Columbia*, 351 F.3d 519, 523-24 (D.C. Cir. 2003) (internal quotation marks omitted).

George claims that her discharge was the result of discrimination based on her race, sex, and national origin, in violation of Title VII's mandate. Such disparate-treatment claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That case "set forth the basic allocation of burdens and order of presentation of proof" in such cases, as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citation and internal quotation marks omitted).

The Court has emphasized, however, that the "central focus of the inquiry" in such cases "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Constr.*

*Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)); *see also Burdine*, 450 U.S. at 253 (noting that the "ultimate burden," which "remains at all times with the plaintiff," is to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff"). The *McDonnell Douglas* framework "was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco*, 438 U.S. at 577). Accordingly, the Court has instructed that

> [w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff."

*Id.* (quoting *Burdine*, 450 U.S. at 253).

In this case, as part of the parties' cross-motions for summary judgment, the Government articulated legitimate reasons for George's discharge and proffered evidence in support of those reasons. Accordingly, heeding *Aikens*' instruction, we need not address the Government's contentions that George failed to make out a prima facie case. Instead, we proceed to "the ultimate question of discrimination *vel non*." *Id.* at 714; *see also Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1154 (D.C. Cir. 2004) ("[O]nce the defendant has responded with rebuttal evidence, the factfinder normally proceeds to the ultimate issue on the merits to determine whether the employer intentionally discriminated against the plaintiff."). Of course, consideration of this question requires us to evaluate all of the evidence before us, including the same

evidence that a plaintiff would use to establish her prima facie case. *See Teneyck*, 365 F.3d at 1151 ("The ultimate question . . . is whether intentional discrimination may be inferred from all the evidence before the trier of fact. This includes '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" (quoting *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002) (internal quotation marks omitted))).

We note in passing that, in assessing whether George made out a prima facie case, the District Court committed two legal errors. First, the District Court held that, "[t]o establish a prima facie case of disparate treatment discrimination, the plaintiff must show [*inter alia*] that she was treated differently than similarly situated employees." *George*, slip op. at 7, J.A. 576. This is not a correct statement of the law. We have made clear that a plaintiff makes out a prima facie case of disparate-treatment discrimination "by establishing that: '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). One method by which a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class. *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). But this is not the only way.

In *Stella* and *Teneyck*, we made clear that another way to satisfy *Stella*'s third prong is to show that the adverse employment action "is not attributable to 'the two most common legitimate reasons on which an employer might rely to reject a

job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" *Stella*, 284 F.3d at 145 (quoting *Teamsters*, 431 U.S. at 358 n.44); *see also Teneyck*, 365 F.3d at 1150-51. "Elimination of these reasons . . . is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Teamsters*, 431 U.S. at 358 n.44. In the context of a discharge claim, this method of establishing the prima facie case would require a showing that the discharge was not attributable to the two analogous common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether. *See* 1 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 8.08[4] (2d ed. 2005).

The District Court also erred in suggesting that, "[t]o establish a prima facie case of discrimination in a discharge decision, the plaintiff must show [*inter alia*] replacement by a person of equal or lesser ability who is not a member of a protected class." *George*, slip op. at 7, J.A. 576. This too is an incorrect statement of the law. In *Stella*, we made it clear that "a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case under *McDonnell Douglas*," noting that such a requirement would go beyond what is necessary to create an inference of discrimination. *Stella*, 284 F.3d at 146; *see also Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (confirming, in light of *Stella*, the prima facie test for discriminatory non-promotion).

Applying the correct legal standards to the record at hand, it appears that George made out a prima facie case. She is a member of a protected class, she suffered an adverse employment action, and her discharge gave rise to an inference of discrimination, because, as we explain below, George created a genuine issue as to whether she was performing at a

satisfactory level and her discharge was not precipitated by the elimination of her job.  We make this point on the prima facie case not to "evade[] the ultimate question of discrimination *vel non*," *Aikens*, 460 U.S. at 714, but rather because George's prima facie case is part of the evidence we must consider in addressing that question.

In assessing the issue of discrimination, the question here is whether, in light of the record now before us, a reasonable jury could find that EPA officials acted pursuant to unlawful motives when they fired George.  As noted above, at the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts – these are jury functions, not those of a judge ruling on a motion for summary judgment.  Therefore, in determining whether the District Court erred in granting judgment in favor of EPA, we must view all of the evidence in the light most favorable to George.  And in assessing George's discrimination claims to determine whether a jury could reasonably rule in her favor, we remain mindful that a plaintiff can show discrimination "either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256; *accord Aikens*, 460 U.S. at 716.

Usually, proffering "evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury."  *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  We think that George has proffered ample evidence by which a reasonable jury could conclude that EPA's stated reasons for her termination are "unworthy of credence."  George vigorously disputes the validity of the reasons cited by EPA, creating a genuine dispute over these material facts.  Although

a jury may ultimately decide to credit the version of the events described by Brown and Kelly over that offered by George, this is not a basis upon which a court may rest in granting a motion for summary judgment.

As already noted, EPA's discharge letter to George listed several reasons for its conclusion that George's "skills and conduct do not match the mission-based needs of this organization." Similarly, Brown declared in an affidavit that George "was terminated because of problems associated with her conduct and performance," including "problems interacting with other staff," making "rude comments and loud outbursts which affected the morale of the office," and deficiencies in performance. In its brief to this court, EPA argues that no reasonable jury could conclude that EPA's reasons for discharging George were pretextual, because it is "undisputed" that George "suffered from both conduct and performance deficiencies while she was employed by the Agency." Br. for Appellee at 19.

While there is no doubt that the record contains evidence to support EPA's claim that George had "conduct and performance deficiencies," this evidence is not undisputed. For one thing, George's January 1999 performance review tends to refute the suggestion that she had problems on the job. The evaluation states that George "routinely" meets her deadlines, that she "[w]orks effectively with office staff," and that her work "require[s] no more than minor revisions" and "shows considerable thought, insight and creativeness." EPA notes, however, that the testimony of many of the OASBO employees corroborates EPA's claims that George "was not adequately performing her duties, lacked interpersonal skills and disrupted the working environment." Br. for Appellee at 18-19. It is true that some OASBO employees confirmed in affidavits that George had some of these problems, but the testimonial statements of these employees paint a different picture and a

number are favorable to George. Moreover, save for one exception, none of the employees ever complained to Brown or Kelly about George. In the one instance in which an employee did raise a complaint (relating to George's failure to identify the state corresponding to a phone number's area code when transcribing Hotline messages), the employee acknowledged that the issue was a "small point" and "not a big problem." Medbery Depo. at 48, *reprinted in* J.A. 516. This employee testimony directly undermines EPA's repeated explanation that "[OASBO] employees have made numerous complaints to [Brown] about [George's] interactions with them, leading to her conclusion that [George] cannot work effectively with the group" and that "[v]irtually all of the staff, with the exception of one, complained about how Ms. George related to them and her conduct."

In addition, George has maintained that her work was satisfactory and that her co-workers were at fault for the confrontations she had with them. There is nothing to indicate that her assessment is either incredible or fanciful. Indeed, her performance evaluation and some of the statements from other employees support George. Therefore, there is a genuine issue as to George's performance and conduct. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("[T]here is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion."). Combined with George's other evidence, there is no question that a reasonable jury could conclude that George did not suffer from "performance and conduct deficiencies" and that EPA's explanation is therefore not worthy of credence. *See* 1 LARSON, *supra*, § 8.04, at 8-62 ("[P]retext may usually be established by demonstrating that the employer's proffered reason is simply false.").

Furthermore, an employer's reason need not be false in order to be pretextual. Here, for instance, George has also proffered evidence that the white male engineers in her office escaped discipline despite engaging in verbal arguments and incorrectly handling Hotline messages, the same conduct for which George allegedly was fired. EPA responds that this evidence is not probative of disparate treatment, because the other engineers in the office were not similarly situated to George.

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C. Cir. 1997). EPA argues, however, that George and the other engineers were not similarly situated, as a matter of law, because she was a probationary employee and they were not. EPA is correct that we have held that probationary employees and permanent employees are not similarly situated, observing that, under federal regulations, probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee. *See Holbrook*, 196 F.3d at 262; *McKenna v. Weinberger*, 729 F.2d 783, 789-90 (D.C. Cir. 1984). *See generally* 5 C.F.R. §§ 315.801-.806 (2005) (rules governing probationary employment). Here, however, the other engineers were not federal civil servants, but were participants in EPA's Senior Environmental Employment Program. George asserts that, as such, these engineers "were *de facto* 'at-will' employees . . . who could be terminated at any time, without notice and for any non-discriminatory reason," Br. of Appellant at 30, and EPA does not dispute this characterization. Under these circumstances, we think that a reasonable jury could conclude that George and the other engineers were similarly situated.

EPA also contends that George and the other engineers cannot be considered similarly situated because "the testimony is overwhelming that no OASBO employee engaged in violations similar in both frequency and severity as to what Ms. George is alleged to have done here." Br. for Appellee at 15. This, however, misses the point. The extent of George's violations is itself in genuine dispute. Thus, although EPA is correct that the evidence does not demonstrate that any other OASBO employee engaged in violations to the same extent to which George is *alleged* to have committed infractions, a reasonable jury could conclude that other employees engaged in violations to the same extent as George *actually* did. Thus, in light of George's evidence that EPA's reasons are not in fact true, combined with her evidence that, to the extent that they may be found to be true, they could not have formed the basis for her discharge in light of similar violations by the other OASBO engineers, a reasonable jury could decide that EPA's reasons are a pretext for discrimination.

We note, however, that just as an employer's reason need not be false to be proven pretextual, conversely, proving that an employer's reason is false will not always be sufficient to demonstrate pretext. This is so because an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." (internal quotation marks and alterations omitted)). Of course, the fact that a proffered reason is objectively false may undermine an employer's professed honest belief in that reason, but this is not always so.

Accordingly, EPA could prevail on its motion for summary judgment, despite a genuine dispute over the objective validity of its reasons, if it were able to demonstrate the absence of a genuine dispute in the record over whether Kelly honestly and reasonably believed in those reasons. EPA, however, did not rely on this theory before us. Rather, EPA's argument that there was no genuine dispute over the validity of its reasons was based on its contention that it was "undisputed" that George in fact "suffered from both conduct and performance deficiencies." *See* Br. for Appellee at 17-20. On that score, as we have already discussed, there is indeed a genuine dispute.

Accordingly, we will reverse the District Court's grant of summary judgment in favor of EPA on George's discrimination claims. Because the argument was not presented to us, our ruling does not preclude the possibility that EPA might be able to prevail on a motion for summary judgment based on the theory that Kelly honestly and reasonably believed the reasons he gave for George's discharge. EPA's success under such a theory will ultimately depend on whether, in light of whatever facts George identifies tending to undermine Kelly's credibility, it can nevertheless be decided *as a matter of law* that Kelly possessed a good-faith belief in those reasons. To the extent that Brown, though not officially the decisionmaker who fired George, participated in and influenced Kelly's decision, her good-faith belief in the proffered reasons also becomes relevant. *Cf. Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.") (citing *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) ("[A]n employer cannot escape responsibility for discrimination when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [a protected class]." (alterations omitted))).

### C. *The Hostile Work Environment Claim*

"'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted)). George argues that she was subject to such an abusive work environment, citing her confrontations with her co-workers and her allegation that she was thrice told to "go back where she came from."

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The Supreme Court has made it clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citation and internal quotation marks omitted). In light of these well-established principles, the District Court correctly recognized that the facts alleged by George, even if true, would not permit a reasonable jury to conclude that George's workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." At best, they constitute exactly the sort of "isolated incidents" that the Supreme Court has held cannot form the basis for a Title VII

violation. Accordingly, the District Court's grant of summary judgment to EPA on this claim was proper.

**D.** *The Retaliation Claim*

Title VII's opposition clause makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). George claims that she was discharged in retaliation for engaging in such protected activity. She notes that, shortly after she met with Johnson in the Office of Human Resources, Brown held a meeting with the clerical staff at which she told them to "keep their distance" from George because she was making "complaints." George also notes that Kelly's decision on March 2 to terminate her employment came within hours after she complained to Kelly and told him that she planned to file a complaint with the Office of Civil Rights.

We have held that "an employee seeking the protection of the opposition clause [must] demonstrate a good faith, reasonable belief that the challenged practice violates Title VII." *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981). As noted above, the incidents of which George complained could not reasonably be thought to constitute an abusive working environment in violation of Title VII. Accordingly, George's complaints to Kelly did not constitute "oppos[ition]" to a "practice made . . . unlawful" by Title VII within the meaning of § 2000e-3(a). *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam).

### III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the District Court with respect to George's discrimination claims and affirm its judgment as to the remaining claims. The case is hereby remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*