# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 23, 2011      Decided January 27, 2012

No. 10-5043

MATTHEW JOSEPH MCGRATH,
APPELLANT

v.

HILLARY RODHAM CLINTON, SECRETARY OF STATE, IN HER
OFFICIAL CAPACITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-02011)

*Leslie D. Alderman*, *III* argued the cause for appellant.
With him on the briefs was *William Aramony*.

*Brian P. Hudak*, Assistant U.S. Attorney, argued the cause
for appellee. With him on the brief were *Ronald C. Machen*, *Jr*.,
U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   Plaintiff Matthew McGrath contends that his supervisor at the Department of State gave him negative performance reviews in retaliation for his opposition to discriminatory conduct, in violation of Title VII of the Civil Rights Act of 1964.  The district court granted the Department's motion for summary judgment and dismissed the case.  Because no reasonable juror could conclude that McGrath's supervisor unlawfully retaliated against him, we affirm.

I

McGrath served as a Foreign Service Officer in the State Department from 1984 until 2004.  The events at issue in this case began in September 2001, when McGrath became unit chief of the Cultural Programs Division, an office within the Department's Bureau of Educational and Cultural Affairs.  McGrath was responsible for supervising six program officers and two administrative assistants.  His difficulties with his own supervisor, Van S. Wunder III, began soon after McGrath started his job and accelerated in the spring of 2002, when Wunder sent him a memorandum on March 8 that sharply criticized his performance.  This memorandum was followed by a negative Employee Evaluation Report (EER), which both parties agree was based largely on the March 8 memorandum.  A second negative EER followed the first, identical except that it was approved by Wunder's supervisor, who added his own critical comments.

Soon thereafter, McGrath was involuntarily removed from his position as unit chief.  For several months, he remained employed by the Department but without an assignment.  Although he was eventually transferred to another unit, he was terminated altogether in 2004.   McGrath alleges, and the

Department does not dispute, that the decision to terminate him was "based in substantial part" on the 2002 EERs. *McGrath v. Clinton*, 674 F. Supp. 2d 131, 139 (D.D.C. 2009).

In 2005, McGrath filed a complaint in district court charging the State Department with, inter alia, retaliating against him in violation of Title VII, 42 U.S.C. §§ 2000e-3(a), 2000e-16(a).[1] McGrath is a white male. The core of his charge is that Wunder, also a white male, tried to force him to document performance deficiencies of the only African-American program officer in the unit, Ms. E.J. Montgomery, for discriminatory reasons and with an eye to her eventual termination. According to McGrath, when he refused to do so, Wunder retaliated by giving him unfavorable employment reviews that eventually led to his own termination.

The district court found that the Department "provide[d] a legitimate, non-retaliatory justification for the plaintiff's negative evaluation reports and his involuntary curtailment," *McGrath*, 674 F. Supp. 2d at 145, and that McGrath failed to produce evidence from which a reasonable jury could find the State Department retaliated against him for taking protected action, *id.* at 147. Accordingly, the court granted the Department's motion for summary judgment. McGrath now appeals.[2]

---

[1]Before filing his complaint in district court, McGrath filed a complaint with the Equal Employment Opportunity Commission (EEOC) that alleged similar grievances. The EEOC found in favor of the State Department on all counts. *McGrath v. U.S. Dep't of State*, EEOC Case No. 100-2003-08249X (May 19, 2005) (J.A. 127-38). Both parties rely in part on testimony taken during the EEOC proceedings, which this opinion cites as "EEOC Tr. at __."

[2]In addition to alleging retaliation, McGrath's complaint raised several other claims that the district court also dismissed on summary

4

II

We review the district court's decision to grant summary judgment de novo. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The court may grant summary judgment only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Title VII prohibits federal agencies from discriminating against their employees based on race or sex. 42 U.S.C. § 2000e-16(a). It also makes it unlawful to "discriminate against" -- i.e., retaliate against -- an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a); *see Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action "because" the employee opposed the practice.[3] The State Department does not dispute that the

judgment. A special panel of this court granted the State Department's motion for summary affirmance as to all claims other than the retaliation claim that we address here. *See* Order, *McGrath v. Clinton*, No. 10-5043 (D.C. Cir. Aug. 10, 2010).

[3]Although these are often described as the elements that a plaintiff must show to establish a "prima facie" case of retaliation, *see, e.g.*, *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), they are also the elements that a plaintiff must ultimately prove in order to win his case. The first and third elements derive from Title VII's express statutory language. The second is the Supreme Court's gloss on the

actions it took against McGrath -- giving him poor performance reviews that eventually resulted in his termination -- were materially adverse. The following sections address the remaining two elements of McGrath's cause of action for retaliation.

A

Title VII bars federal agencies from retaliating against an employee because he has opposed "a practice made an unlawful employment practice" by the statute. 42 U.S.C. § 2000e-3(a); *see Calhoun*, 632 F.3d at 1261. We have interpreted this phrase as extending to a practice that the employee reasonably and in good faith *believed* was unlawful under the statute. *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005); *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981); *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (noting this interpretation, but declining to rule on its propriety "because even assuming it is correct, no one could reasonably believe that the incident recounted . . . violated Title VII"). But if the practice the employee opposed is not one that could reasonably and in good faith be regarded as unlawful under Title VII, this element is not satisfied. *See Clark Cnty.*, 532 U.S. at 271.

McGrath alleges that his specific act of "opposition" was his resistance to Wunder's alleged instruction that he document

---

phrase "discriminate against." *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). Where, as here, the employer has proffered a non-retaliatory explanation for a materially adverse employment action, the sufficiency of the plaintiff's prima facie case is no longer in issue, and "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." *Jones*, 557 F.3d at 678; *see Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009).

deficiencies in Montgomery's work -- particularly, her inability to meet deadlines -- in a manner that McGrath claims was intended to prepare the way for her termination.[4] McGrath asserts that the instruction was an unlawful employment practice under Title VII because it was motivated by Montgomery's race and gender.

According to McGrath, soon after he started his job in the Cultural Programs Division in 2001, Wunder spoke to him about Montgomery's work. Montgomery suffers from a disability, and McGrath charges that Wunder told him to start documenting her job performance with the goal of eventually firing her. When he refused to do as he was told, McGrath claims that Wunder shortened the home leave that McGrath had planned to take that winter. He further alleges that when he returned from leave on January 7, 2002, Wunder again told him to document Montgomery's performance. This admonition was allegedly repeated at a meeting on March 8, at which Wunder gave him a memorandum criticizing his performance and said that it would "reflect badly" on him if he did not begin to document Montgomery's deficiencies. McGrath Br. at 6. McGrath charges that this constituted a threat to give him negative employment reviews and then to fire him, which is what ultimately transpired.

---

[4]In the district court, McGrath also cited as "acts of opposition" complaints he filed with his departmental equal employment officer, and later with the EEOC. On appeal, however, he stated that these were not really relevant to the retaliation analysis because they were filed *after* Wunder had already sent him the negative March 8, 2002 performance memorandum. As McGrath's counsel explained at oral argument: "[B]y March 8, Wunder's already decided that McGrath is gone, voluntarily or involuntarily. So anything that happens after March 8 is irrelevant -- it's a foregone conclusion that McGrath is gone." Oral Arg. Recording at 22:52-23:07.

The evidence, however, does not support McGrath's allegation that he opposed an employment practice that he could reasonably have regarded as unlawful under Title VII. According to McGrath's testimony at an EEOC hearing, *see supra* note 1, he told Wunder that *he* believed Wunder's treatment of Montgomery was racially discriminatory. EEOC Tr. at 196 (J.A. 824). But McGrath's unsupported assertion -- whether made to Wunder or anyone else -- neither makes the accusation true nor makes it reasonable for him to have believed it was true. McGrath also claimed that Wunder told him: "If you're not going to do this [document Montgomery's performance deficiencies], then it's going to reflect badly on you." *Id.* at 193 (J.A. 821). As McGrath describes it, however, this was at worst a threat to downgrade McGrath's own employment review if he refused to follow a management directive -- an act that Title VII does not bar unless it is accompanied by unlawful animus. And there is nothing in McGrath's description of his conversation with Wunder to suggest that it was.

When asked at oral argument for his best evidence that Wunder's directive was motivated by discrimination, McGrath pointed to Wunder's own description of their January 7 exchange regarding Montgomery. *See* Oral Arg. Recording at 6:50-7:50. That description was as follows:

> Q: Did you tell Mr. McGrath to document Ms. Montgomery's performance and either say or suggest that he do so in order to use this information to terminate her employment? . . . .
>
> A: I did not instruct Mr. McGrath to document Ms. Montgomery's performance for the purposes of possible termination. [In] late December 2001 or early January 2002, I had a conversation with Mr. McGrath

> concerning his staff. *Mr. McGrath raised the issue of limitations he perceived in the performance of various members of his staff, and noted that one of these limitations concerned Ms. Montgomery*, who suffers from [a] . . . medical condition [that] makes it difficult for Ms. Montgomery to type, which means that it is difficult for her to prepare the many written communications that Program Officers must complete. . . . *I advised Mr. McGrath that EEO regulations require that appropriate compensation be made for employees with disabilities, but that if performance after compensation has been made is still not adequate, then it was the duty of the supervisor to deal with the situation.* I noted that EEO regulations do not require that an employee be kept in the same position if that employee cannot perform at an acceptable level after compensatory steps have been taken.

Wunder Decl. at 3-4 (J.A. 398-99) (emphases added).

As indicated by the first passage italicized above, it was McGrath -- not Wunder -- who brought up Montgomery's alleged performance limitations. Indeed, two pages later, Wunder states that he "was not in a position to directly observe Ms. Montgomery's performance," and that, to his "direct knowledge, there were no major duties that Ms. Montgomery was not proficient at performing." *Id.* at 6 (J.A. 401). This hardly suggests Wunder was implying that McGrath should terminate Montgomery, let alone for an unlawful reason.

As indicated by the second italicized passage, it is also clear that Wunder was not telling McGrath that he should terminate Montgomery, but rather that he should accommodate her, advising "that EEO regulations require that appropriate

compensation be made for employees with disabilities." Indeed, later in the same paragraph Wunder states that he told McGrath:

> If Ms. Montgomery was indeed limited in her performance, then Mr. McGrath had the first line of responsibility for working with her to identify compensatory steps that could respond to her physical condition. I mentioned such examples as providing voice-recognition software to assist her in drafting correspondence or shifting duties within the Cultural Programs Division to lessen the correspondence requirements on Ms. Montgomery.

*Id.* at 4 (J.A. 399).

McGrath emphasizes Wunder's concession that he also told him that "EEO regulations do not require an employee to be kept in the same position if that employee cannot perform at an acceptable level after compensatory steps have been taken." But this does no more than correctly state the law under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq*. *See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 4 (D.C. Cir. 2010). Moreover, as there was no suggestion in this exchange that compensatory steps would in fact be insufficient, these words cannot reasonably be read as suggesting a plan to terminate Montgomery. Indeed, McGrath does not dispute that Wunder rated Montgomery as "excellent" on her own 2002 EER; that Wunder himself took steps to accommodate her disability by obtaining voice recognition software; and that Montgomery was still employed in the unit as of the time the lawsuit was filed. *See* Def.'s Statement of Undisputed Facts ¶¶ 135-39 (J.A. 669-70); Pl.'s Statement of Disputed Facts at 22 (J.A. 740) (no response).

Finally, this exchange does not mention -- directly or by implication -- race, gender, or any other motive prohibited by Title VII. Even if it could be read as suggesting discrimination based on disability (and we do not believe it can), such discrimination is not an act "made unlawful by this subchapter" -- i.e., by Title VII -- and hence is not subject to its anti-retaliation provision. Although discrimination based on disability *is* made unlawful by the ADA, McGrath's complaint relies solely on Title VII and never mentions the ADA or its anti-retaliation provision, 42 U.S.C. § 12203. In short, there is nothing in McGrath's "best evidence" to suggest that the act of opposition he asserts -- refusing to document Montgomery's shortcomings -- had anything to do with opposing a violation of Title VII.

Asked at oral argument for any other evidence he had regarding Wunder's alleged discriminatory animus, McGrath cited an affidavit by a former program assistant, LaFaye Proctor, who stated that "Ms. Montgomery later told me that she complained about Mr. Wunder to the union and that, as a result, Mr. Wunder . . . had to go to diversity training classes." Proctor Aff. at 2 (J.A. 1208). Regardless of whether such a statement by Montgomery could support the contention that Wunder harbored racial animus against her, Proctor would not be permitted to testify about it at trial because -- coming from Proctor's mouth -- it would be pure hearsay. "It therefore counts for nothing" in an opposition to summary judgment. *Gleken v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *see Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007). Montgomery's own testimony, by contrast, was not that she went to her union representative because of something Wunder said or did to her, but rather because she heard "rumors" that he was going to fire her. EEOC Tr. at 354-55 (J.A. 614). McGrath concedes, however, that it was he -- not Wunder -- who spread such rumors. EEOC Tr. at 199 (J.A. 826). (Montgomery also

denied knowing anything about Wunder having been sent to diversity training. EEOC Tr. at 355 (J.A. 614)).[5]

In sum, because McGrath fails to offer evidence from which a jury could conclude that he opposed a practice that could "reasonably be thought" to violate Title VII, he fails to satisfy the first element of his cause of action. *George*, 407 F.3d at 417; *see Clark Cnty.*, 532 U.S. at 270.

B

McGrath has no more luck with his effort to establish the third element of a Title VII retaliation claim: that the employer took a materially adverse action against the employee "because" the employee opposed a protected practice. To establish this element, the employee must proffer evidence from which a reasonable jury could infer the employer's retaliatory intent. *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). Although such evidence may be direct, circumstantial, or both, *see McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000), McGrath has proffered none at all.

We have already discussed the principal direct evidence upon which McGrath relies: his exchange with Wunder regarding Montgomery. As we have noted, there was nothing in that conversation from which a jury could reasonably conclude that Wunder's subsequent negative reviews of McGrath were in retaliation for his opposition to protected activity.

---

[5]The remainder of the evidence upon which McGrath relies is even weaker than the evidence discussed in the text, and even less closely related to the asserted act of discrimination (against Montgomery) that McGrath claims to have opposed. Accordingly, it does not merit further discussion.

In the absence of direct evidence of retaliation, we analyze a plaintiff's claims under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Calhoun*, 632 F.3d at 1261; *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). Where, as here, "the employer has proffered a legitimate, [non-retaliatory] reason for a challenged employment action, the 'central question' is whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee" in violation of Title VII. *Calhoun*, 632 F.3d at 1261 (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). McGrath's contention is that the Department's rationale for his negative reviews was so patently pretextual that it justifies an inference that the true reason was retaliation for his opposition to Wunder's allegedly unlawful direction to document Montgomery's deficiencies.

The State Department's rationale for McGrath's poor reviews, as reflected in the March 8 memorandum and the two negative EERs, can be boiled down to two principal concerns: (1) McGrath failed to adequately supervise his staff; and (2) he botched an important assignment that embarrassed his division. The record in this case contains detailed descriptions of the various incidents giving rise to these concerns as well as several others, and is well documented in the district court's opinion. *See McGrath*, 674 F. Supp. 2d at 134-38.

As to the first concern, McGrath does not dispute that, shortly after he began serving as unit chief of the Cultural Programs Division, he ceased holding weekly staff meetings. *See* Pl.'s Statement of Disputed Facts ¶ 24 (J.A. 721). By way of explanation, McGrath says that he did so because he found the meetings unproductive and thought individual conversations more useful. But he does not deny that Wunder instructed him

to resume the meetings and that he failed to heed that instruction. McGrath Decl. at 16 (J.A. 1066). Nor does McGrath dispute that at least three members of his staff complained to Wunder about his performance as a supervisor, describing McGrath as generally unresponsive to requests for guidance or feedback. *See* EEOC Tr. at 375-78 (J.A. 334-35) (Kathryn Wainscott); *id.* at 559-60 (J.A. 457) (Leanne Mella). Indeed, one employee characterized McGrath's supervision of the office as "almost non-existent." *Id.* at 297 (J.A. 325) (Susie Baker).

With respect to the second concern, the State Department describes an incident in January of 2002, the central facts of which McGrath again does not dispute. McGrath had been tasked with arranging a cultural event set for January 20, two days after he was scheduled to depart for another leave. At the event, then-Secretary of State Colin Powell was to present jazz musician Billy Taylor with a "certificate of appreciation" at the Kennedy Center for the Performing Arts. When Wunder asked McGrath before he departed whether there were any important projects that he had not yet completed, McGrath said there were none. In fact, however, the certificate had not been printed and the Secretary's remarks had not been prepared. Again, McGrath has an explanation: because Taylor had been ill and Secretary Powell was scheduled to be away that weekend, McGrath says he concluded that the ceremony was not going to take place. Unfortunately for McGrath, the event did take place, with Secretary Powell's wife and Taylor's daughter substituting for the principals. Because McGrath had failed to perform his assigned tasks, someone else had to hastily prepare remarks for the Secretary's wife, and she had to present Taylor's daughter with a blank certificate. As Wunder told McGrath in an e-mail to which McGrath never responded, the matter had "blown up all the way to the Secretary's office" and "reflect[ed] very badly on our office and the bureau." J.A. 1137.

14

Taken together, and relying on facts that McGrath does not dispute, these incidents constitute legitimate, non-retaliatory reasons for the negative employment reviews McGrath received. McGrath does offer explanations for some of his actions, and he notes that he made useful contributions on specific programs (a point his 2002 EERs acknowledge, *see* J.A. 505, 526). At best, however, these "responses constitute[] an argument that, notwithstanding [his] failings, [the Department] should not have terminated [him] because there were extenuating circumstances and there were some positive attributes to [his] performance." *Waterhouse*, 298 F.3d at 995. "But courts are without authority to 'second-guess an employer's personnel decision absent a demonstrably discriminatory motive,'" and McGrath's "responses offer[] no grounds for a rational juror to conclude that the reason [he] was fired was [retaliation] rather than poor performance." *Id.* (quoting *Fishbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996) (additional internal quotation marks omitted)).

III

Because no reasonable juror could find that McGrath satisfied either of two required elements of Title VII's cause of action for unlawful retaliation, the district court's grant of summary judgment in favor of the Department of State is

*affirmed.*