# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 22, 2013        Decided May 17, 2013

No. 11-5120

VERNARD EVANS,
APPELLANT

v.

KATHLEEN SEBELIUS, SECRETARY, U.S. DEPARTMENT OF
HEALTH & HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01077)

*Ellen K. Renaud* argued the cause for appellant. With her on the briefs was *David H. Shapiro*.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

TATEL, *Circuit Judge*: Appellant alleges that her employer, the United States Department of Health and Human Services, denied her a promotion and a transfer in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967. The district court granted summary judgment for the government. For the reasons set forth below, we reverse in part and affirm in part.

**I.**

At the start of President George W. Bush's Administration, plaintiff Vernard Evans, a fifty-four-year-old African American, worked as a GS-13 Developmental Disabilities Program Specialist in the Administration on Developmental Disabilities (ADD), a division of HHS's Administration for Children and Families (ACF). At all times relevant to this litigation, Evans's direct supervisor was Leola Brooks. Until July 27, 2001, Commissioner Sue Swenson, a holdover from the Clinton Administration, managed ADD. After Swenson left ADD, Deputy Commissioner Reginald Wells served as Acting Commissioner until Bush Administration appointee Patricia Morrissey became Commissioner on August 27, 2001.

Immediately upon entering office, the Bush Administration imposed a hiring freeze. Then, when Tommy Thompson became HHS Secretary in February 2001, he issued a memorandum requiring managers to "defer decisions to fill positions at the GS-13 through SES levels until I have had the opportunity to review staff deployment throughout the Department."

Despite the hiring freeze, in March 2001, outgoing Commissioner Swenson recommended the creation of a GS-14, non-supervisory Lead Developmental Disabilities Specialist (LDDS) position. Shortly thereafter, Evans applied for and was interviewed for that position. On July 17, Brooks selected Evans and another African American for two LDDS positions. But because of the hiring freeze, neither selectee was promoted. Swenson declined to push for formal approval of the LDDS position, believing that her successor should make the final decision.

Over the next few months, the new Administration replaced the hiring freeze with a series of hiring "controls." Specifically, in October 2001, Assistant Secretary for Administration and Management Ed Sontag published a memorandum requiring his approval for any promotions to positions at GS-14 and above. In November 2001, Assistant Secretary for Children and Families Wade Horn issued a memorandum rescinding the requirement that Assistant Secretary Sontag approve promotions for all non-supervisory GS-14 and GS-15 positions. The memo nonetheless required Horn's approval for promotions to GS-13 and above. And in March 2002, Horn announced at an "All Hands Meeting" that the hiring freeze was no longer in effect.

Despite the relaxation of the hiring controls, Evans was never promoted to the LDDS position, and she retired in April 2002. The record reveals that no official—Clinton holdover or Bush newcomer—gave final authorization for the LDDS position. The record is unclear as to who, if anyone, made the affirmative decision to cancel the position.

Both before and after her retirement, Evans sought to find out why she had not been promoted. She claims that HHS human resources officials told her that her promotion would

be pushed through after the hiring controls were removed. Evans's union representative was told that the promotion never occurred because of the hiring controls and that the LDDS position was "officially cancelled" in March 2002. Evans also sought the assistance of United States Senator Paul Sarbanes, and in response to an inquiry from the Senator's office, Assistant Secretary Horn stated that "Evans could not be placed in the [LDDS] position because ACF was under Departmental and agency hiring controls and the position could not be filled. ADD subsequently elected to cancel the vacancy announcement, thereby nullifying the selection recommendation." Finally, responding to Evans's Freedom of Information Act request, HHS revealed that at least three white employees were promoted notwithstanding the hiring controls.

Significantly for this case, one of those white employees, Faith McCormick, was detailed as a GS-15 Executive Assistant to incoming Commissioner Morrissey. Morrissey hand-selected McCormick for the detail, doing so without a competitive-selection process or opportunity for anyone else to apply. McCormick's detail lasted for 154 days, after which she was permanently selected for the position, this time following a competitive process.

After exhausting her administrative remedies, Evans filed suit in the United States District Court for the District of Columbia under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. As relevant to this appeal, Evans alleged that two personnel actions—HHS's failure to promote her to the newly created LDDS position and Morrissey's selection of McCormick for a detail as her Executive Assistant—were infected by race and age discrimination. The district court granted summary

judgment to the government on all claims. Regarding the LDDS position, the district court found that Evans failed to establish a prima facie case of discrimination, but following this Circuit's directive in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), it went on to address the ultimate question of discrimination and held that Evans failed to rebut the government's legitimate, non-discriminatory reason for not promoting her—that the LDDS position was cancelled administratively. Regarding the Executive Assistant position, the district court concluded that the denial of the detail did not qualify as an adverse employment action. *See Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (explaining that an adverse action is a prerequisite for a Title VII claim).

Evans now appeals. Because her briefs make no effort to advance her age discrimination claims, they are waived. *See Ark Las Vegas Restaurant Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (noting that arguments not raised in briefs are waived).

**II.**

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Evans and drawing all reasonable inferences accordingly. *See Salazar v. Washington Metropolitan Area Transit Authority*, 401 F.3d 504, 507 (D.C. Cir. 2005). We will affirm only if no reasonable jury could find in Evans's favor. *See id.*

In Title VII cases, we traditionally follow the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But where, as here, the employer has put forward a legitimate, non-discriminatory explanation for its decision, the *McDonnell Douglas* inquiry

distills to one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" *Brady*, 520 F.3d at 494; *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (explaining that "the prima-facie-case aspect of *McDonnell Douglas* is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for its decision"). "We consider this question 'in light of the total circumstances of the case,' asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.' " *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289, 1291 (D.C. Cir. 1998) (en banc)). Employees may cast doubt on the employer's proffered reason by, among other things, pointing to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Brady*, 520 F.3d at 495 n.3.

## A.

We start with Evans's claim that she was denied the LDDS position because of her race. In support, she argues that the government's proffered reason is pretext because HHS "has given different explanations for the cancellation at different times," because "[n]o one admits to making the decision to cancel the promotion," and because "the evidence

shows that . . . several white employees (and no African-Americans) were promoted" during the hiring controls. Appellant's Br. 13. Evans also cites record evidence of allegedly racially insensitive remarks. For its part, the government argues that the LDDS position went unfilled because it never found a champion in the new Administration. The position therefore "died a quiet administrative death, due directly to the hiring controls." Appellee's Br. 22. The government further contends that the Secretary's varying explanations are attributable to the gradual shift from a hiring freeze to hiring controls. Despite the government's protestations, we believe that Evans has produced sufficient evidence that, when taken together, could lead a reasonable jury to conclude that the Secretary's proffered reason for cancelling the LDDS position was pretext for racial discrimination. *See Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from *all of the evidence* that the adverse employment decision was made for a discriminatory reason." (emphasis added)).

To begin with, as Evans points out, the government has given shifting reasons for the non-promotion. For example, Evans testified that she was told she would be promoted once the hiring freeze was lifted, only to learn later that the position had been administratively cancelled after the hiring freeze ended. *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (commenting that "shifting and inconsistent justifications are probative of pretext" (internal quotation marks omitted)). Evans also points out that Horn's letter to Senator Sarbanes explaining that Evans could not be promoted because of the hiring controls omits a key fact—that Horn could have approved Evans's promotion. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (explaining that a jury "can reasonably infer from

the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"). Moreover, record evidence indicates that the relevant decision-makers have taken different views on who precisely cancelled the LDDS position. Acting Commissioner Wells testified that he discussed the LDDS position with Morrissey and that she expressed no interest in creating the position. Morrissey, by contrast, testified that she had no role in the final cancellation of the LDDS position because all GS-14 positions were "removed" from her consideration and "no longer existed." Indeed, as the Secretary implicitly concedes, it is unclear who cancelled the LDDS position. *See* Appellee's Br. 9 ("The proposed positions were eventually cancelled administratively, though the record does not provide much detail on precisely how that happened.").

To be sure, as the government argues, there may well be a benign explanation for these shifting rationales: HHS's reasons changed as the hiring freeze morphed into hiring controls. And it may even be, again as the government argues, that the omission from the Sarbanes letter was immaterial. But we need not decide whether these shifting and inaccurate explanations are, by themselves, sufficient for Evans to survive summary judgment because documents released in response to her FOIA request revealed that the hiring controls the government claims prevented her elevation to the LDDS position posed no barrier to the promotion of at least three white employees.

On this point, *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000), is instructive. There, an African American plaintiff was denied a promotion that went to a white employee who was lateralled into the position. The Secretary relied on an Executive Order mandating a reduction in the number of GS-14 and GS-15 employees as its legitimate, non-discriminatory

rationale. But despite the Executive Order, white GS-14s—including the white employee selected for the position sought by the plaintiff—were promoted during that period. Given this, we concluded that "a jury could infer that HHS deliberately misread the Executive Order to favor [the white employee] because it preferred not to promote an African American." *Id.* at 520. So too here. Once the hiring freeze was lifted in late 2001, Horn or Sontag could have approved the LDDS position and promoted Evans. Instead, as in *Cones*, HHS promoted whites, but not African Americans.

The government has no direct response to *Cones*—indeed, its brief fails to even cite the decision. Instead, the government argues that the promoted whites were not similarly situated to Evans. This misses the point. As to this claim, Evans cites the promotion of white employees as evidence that the hiring controls were not insurmountable, not that she was discriminatorily denied one of those positions. Thus, while the government may be correct that the LDDS position met a "quiet administrative death," Appellee's Br. 22, this still begs the *Cones* question of why Evans never found a champion and why only white employees found champions. According to our concurring colleague, the white employees' promotions are not inconsistent with the government's explanation that the hiring controls were "not an impermeable barrier" and "at most" demonstrate that "the government's initial explanation [w]as imprecise." Concurring op. at 6. But the point of *Cones* is not that the white employees' promotions establish that the government gave an imprecise explanation but rather that a reasonable jury could infer that the promotion of white employees—but not African Americans—during the hiring controls is evidence of pretext. *See Cones*, 199 F.3d at 520 ("Because the record contains evidence that downsizing had not prevented

the Department from promoting white GS-14s, a jury could conclude that downsizing was pretext for discrimination.").

Finally, Evans has produced evidence regarding behavior by Morrissey and McCormick that a reasonable jury could interpret as racially insensitive. Debbie Powell, Morrissey's highest-ranking African American subordinate, testified at her deposition that Morrissey frequently referred to the African American women on staff as "those sisters." *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (explaining that use of the term "boy" to refer to African Americans can be evidence of racial animus under certain circumstances). And in her declaration, Powell recounts an incident in which McCormick implied that people from "the Hood" are liars and cheaters. After Powell and McCormick got into an argument over these comments, McCormick tried to explain her behavior by stating: "I'm a hot-blooded Italian and I get angry sometimes." According to Powell, Morrissey failed to respond immediately to these remarks—though Morrissey eventually reprimanded McCormick. Powell also claims that she was involuntarily detailed out of ADD by Morrissey after she complained about McCormick's behavior.

Given this additional evidence, Evans's argument about the government's shifting and inaccurate explanations becomes more salient. For example, a reasonable jury knowing that HHS promoted three whites notwithstanding the hiring controls could be quite suspicious about why the LDDS position was administratively cancelled even though Evans was initially told she would be promoted after the hiring freeze ended. Likewise, a jury, knowing not only about the white employees but also that Morrissey referred to African Americans as "those sisters," could reasonably find that Morrissey was dissembling when she disavowed her involvement in the decision-making process.

In the end, the record supports two plausible interpretations of what happened. One view, urged by Evans, is that Morrissey decided not to create the position because Evans and another African American had been selected to fill the two spots. The other view, urged by the government, is that no one in the incoming Administration championed the creation of the LDDS position. As an appellate court reviewing the district court's grant of summary judgment, we have no authority to choose between these competing views. Given our "obligation to draw reasonable inferences in [Evans's] favor," *Salazar*, 401 F.3d at 509, and given the record evidence that HHS (1) promoted whites but not African Americans during the hiring controls, (2) offered inconsistent and inaccurate explanations, and (3) is unable to identify who cancelled the LDDS position, a reasonable jury, especially in light of Powell's testimony about Morrissey's and McCormick's comments, could find the Secretary's proffered explanation to be nothing more than a veil for racial discrimination. Ultimately, this is precisely the type of factual dispute that "must be resolved in a jury room rather than in the pages of the Federal Reporter." *Czekalski v. Peters*, 475 F.3d 360, 362 (D.C. Cir. 2007).

**B.**

This brings us to Evans's second claim: that she was denied the detail to the Executive Assistant position because of her race. In granting summary judgment to the government, the district court concluded that the denial of the detail did not qualify as an adverse action. We need not address this issue, however, because, as the government urges, we can affirm on an alternative ground, i.e., that Evans has failed to rebut the government's proffered, non-discriminatory reason. *See EEOC v. Aramark Corp.*, 208 F.3d 266, 268 (D.C. Cir. 2000) (explaining that "because we review the district court's

judgment, not its reasoning, we may affirm on any ground properly raised").

Once again, the parties disagree about whether the government has provided a consistent and legitimate explanation. Evans contends that Morrissey gave shifting explanations for selecting McCormick for the detail and emphasizes Morrissey's admission that she sought a Republican "confidant" as her Executive Assistant. *See* 5 U.S.C. § 2302(b)(1)(E) (prohibiting personnel actions based on "political affiliation"). Evans also asserts that proper protocols were not followed in McCormick's selection.

But the government points to a key fact: Morrissey first met Evans in August 2001. Because Morrissey selected McCormick for the Executive Assistant detail prior to this date, the government's argument goes, the record contains no evidence of racial discrimination. Thus, even though Morrissey gave conflicting and illegitimate reasons for selecting McCormick and even though proper protocols were not followed, Evans cannot establish that the Secretary's proffered reasons were pretext for racial discrimination.

Evans has two responses. She first claims that this argument is waived because, she says, the government failed to raise it in the district court. But the government did argue in the district court that Morrissey had never met Evans prior to August 2001. *See, e.g.*, Defendant's Memorandum in Support of Motion for Summary Judgment at 16 ("There is no evidence that Commissioner Morrissey even knew the plaintiff at all at the time she was considering accepting the appointment to ADD and filling the Executive Assistant position or asking Ms. McCormick to detail to the position."). Second, Evans contends that nothing in the record "supports the idea that Morrissey did not know Evans' *race* when she

selected McCormick as her Executive Assistant." Appellant's Reply Br. 21 n.5 (emphasis added). Of course, as Evans emphasizes, an individual could quite plausibly know another person's race before meeting them. But here, the record contains no evidence that Morrissey selected McCormick because she was white or that prior to August 2001 Morrissey was even aware of Evans's existence, much less her race.

Although Evans contends that McCormick's selection as the Executive Assistant was procedurally flawed and infected with partisan motives, she must still provide sufficient evidence that the government's proffered explanation is pretext for *racial* discrimination. *See* 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race . . . ."). Because Evans has failed to make that showing, we affirm the district court's grant of summary judgment for the government on the Executive Assistant detail claim.

## III.

For the foregoing reasons, we reverse in part and affirm in part.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring in the judgment: I join the majority in finding that under the procedure originating in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the government is not entitled to summary judgment on Evans's claim regarding the LDDS position (and also in finding that it is so entitled regarding the "detail" as executive assistant to the Commissioner). My route to this conclusion is more direct than that of my colleagues. They find that while the government offered a legitimate, non-discriminatory explanation for its actions, the self-contradictions in its evidence were a sufficient basis for a jury reasonably to conclude that the explanation was pretextual and that in fact the actions were driven by discriminatory motives in violation of Title VII. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998). I conclude that once we identify the critical government action, the government's problem is that it has offered no explanation at all.

The events culminating in Evans's failure to secure the promotion involve two quite separate elements: a "hiring freeze," which delayed but did not formally doom the promotion, and the cancellation of the position, which extinguished the possibility altogether. Evans indisputably suffered eight or nine months in limbo, from her selection for the LDDS position on July 17, 2001 to April 3, 2002, when she concluded that the government had in fact cancelled the position (which evidently occurred March 7). During all this time Evans remained interested in the position, so much so that she "unretired" in early March 2002 on the false premise that the position was still available and her promotion certificate was still valid. It was only after HHS told Evans that the position had been abolished that she assessed the situation as hopeless and retired permanently. See Evans Aff. at 4.

With respect to the delay (which Evans does not appear to identify as an independent violation of her rights), memoranda offered by the government document the existence and evolution of the hiring controls and unquestionably satisfy the requirement, elucidated by the Supreme Court in its applications of *McDonnell Douglas*, to "produc[e] evidence that the adverse employment actions were taken for a legitimate nondiscriminatory reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations removed); see also *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If accepted by a trier of fact, the memoranda would justify a finding that unlawful discrimination was not the cause of the eight-month window during which Evans waited in vain.

But while the government has spoken of the hiring freeze as the explanation for both the delay and the cancellation, it is hard to spot its relevance to the cancellation. One can imagine such a link. The government might, for example, have introduced evidence of an HHS policy under which vacancies are to be annulled whenever prolonged beyond some set period, or perhaps a rule automatically dispatching any *newly created* position (such as the one awaiting Evans) that goes unfilled too long.

But the government has offered nothing of the sort. In fact, it seems unable even to provide a clear and coherent account of who ordered the cancellation, much less why. Surprisingly, in light of the standard bureaucratic practice of having a form for every action and at least a check-box for the reason, it has not even produced a contemporaneous written record establishing that the cancellation *did in fact occur* on March 7, 2002, much less a contemporaneous explanation. Of course contemporaneity is not required (though obviously it would add credibility), but the government has never, even in this proceeding, supplied evidence giving an explanation. The

best it seems to be able to do is to use its brief (not sworn evidence) to characterize the cancellation as "essentially ministerial" and say that the LDDS position "died a quiet administrative death," Gov't Br. 22, 25. But given the lack of evidence explaining what rules or actions generate such deaths, these are not explanations at all. The resulting deficiencies would seem to preclude a finding that the government has "clearly set forth, through the introduction of admissible evidence, reasons for its actions." *Hicks*, 509 U.S. at 507 (internal quotations removed).

\* \* \*

My colleagues take a different approach and view the case as turning on the sufficiency of Evans's evidence of pretext. In pursuing this inquiry, they reason in the shadow of two decisions, *Reeves* and *Aka*, which they rightly regard as controlling their analysis. "Control" may not be quite the right word, however. The two decisions draw a line, but with a roller brush rather than a fine-line marker. This case seems to me to lie somewhere within that broad swath.

*Reeves* and *Aka* hold that in a federal employment discrimination case, where the employee has the burden of establishing that the defendant's action was motivated by the protected trait in question (e.g., race, sex, age), and the employer has offered an innocent justification, proof "that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it *may be* quite persuasive." *Reeves*, 530 U.S. at 147 (emphasis added). Indeed, it may be so persuasive that, where there is no evidence of reliance on the protected trait *other than* the undermining of the defendant's explanation, the district court, at least sometimes, may not grant judgment as a matter of law against a jury finding of discrimination, *id.* at 148-49, or, more or less equivalently,

may not grant summary judgment for the defendant on the theory that there are no disputed issues of material fact, *Aka*, 156 F.3d at 1288.

Both the *Reeves* and *Aka* courts recognized that mendacity in the employer's explanation strengthened any inference of reliance on the protected trait, but both indicated that evidence supporting a finding of mendacity was not essential. *Reeves*, 530 U.S. at 147; *Aka*, 156 F.3d at 1293-94.

Both courts also recognized the existence of situations where the inference from impeachment of the employer's explanation would not be enough, but the fact patterns given as examples, originally in *Aka* and adopted by the Court in *Reeves*, seem chosen for their improbability. One is the case where the plaintiff's evidence undermines defendant's proffered explanation, only to supplant it with another innocent explanation. The second is the case where the undermining evidence is "weak" and "there is abundant independent evidence in the record that no discrimination has occurred." *Id*. at 1291; *Reeves*, 530 U.S. at 148 (following and citing *Aka*).

Thus at its potential outer edge, the principle allows the plaintiff to get to the jury so long as he or she can point to any snippet of evidence drawing the defendant's explanation in question. Perhaps utterly trivial snippets are inadequate: a conflict among defendant's witnesses over the color of tie worn by one of them at a critical meeting? But one hesitates to speak firmly on such a hypothetical; after all, comparable impeaching evidence is quite standard among criminal defense attorneys' efforts to establish a reasonable doubt in jurors' minds.

The majority's decision illustrates the range and variability of the *Reeves-Aka* framework. To meet her burden

of demonstrating that the government's explanation was pretextual, Evans has drawn attention to omissions and inconsistencies among the statements of various HHS representatives about why her promotion stalled. Specifically, Evans points to HHS's failure to clarify, both to her and to then-Senator Paul Sarbanes, that after November 2001 Evans could have been placed in the LDDS position had the responsible officials secured the approval of Assistant Secretary Wade Horn or Assistant Secretary Ed Sontag—an option created by a relaxation in the controls that permitted the promotion of the three white employees. Evans also notes that HHS has been unable to provide a clear and consistent account of *who* cancelled the LDDS position. Finally, Evans alleges that HHS human resources personnel promised her that she would be placed in the LDDS position after the hiring freeze had been lifted, and that multiple HHS employees gave false assurances that the LDDS position was still available and Evans's promotion certificate still valid in the week prior to the date HHS now contends the position was canceled.

The evidence Evans marshals does not paint a flattering portrait of bureaucracy. It demonstrates that scattered HHS officials were unable to speak with one voice about the precise relationship between the hiring controls and the LDDS position, and about the precise mechanism by which the position was cancelled. It also supports the (one would imagine uncontroversial) thesis that a capable attorney will have little trouble teasing out discrepancies in the accounts of various bureaucratic actors pertaining to personnel actions affecting non-managerial employees—actions that, while understandably of great concern to the affected employees, seem likely to be submerged among a host of similar or more vital issues demanding the attention of senior-level officials and human resources personnel. It is no accident that the "n" in snafu stands for "normal."

What the evidence stressed by Evans does *not* establish is the falsity of the government's basic account of the circumstances that delayed Evans's expected promotion. For reasons already stated, there is no reason to doubt that had there been no hiring controls, Evans would have been placed in the LDDS position upon her selection in July 2001. Even in their relaxed form, the controls for a time created a presumption against promotions to GS-14 positions. (Evans has not advanced any contention that the three promoted women should be viewed as candidates for a post equivalent to the LDDS position.) The promotion of three white individuals does not, in and of itself, establish that by late 2001 the controls had become a charade and had ceased to have any legitimate application. Rather, the promotions prove only that the restrictions were not an impermeable barrier—a fact which adds nuance, but which is nonetheless consistent with the government's account. Evans's evidence is at most a reason to regard the government's initial explanation as imprecise; neither *Reeves* nor *Aka* gives a clue how grave an imprecision must be to qualify as "sufficient evidence for the trier of fact to disbelieve" the proffered explanation. *Reeves*, 530 U.S. at 137.

As for the cancellation of the position itself, the accounts of *who* cancelled the LDDS position conflict. As noted earlier in this opinion, the government never offered any affirmative reason at all for the cancellation; the conflict over exactly whose fingerprints may be on this unexplained event tells little one way or the other.

Yet the majority finds that Evans is entitled to a jury trial under *Reeves* and *Aka*. That is because those two cases allow, *but do not require*, a court to find pretext on the basis of even the mildest inconsistency in the defendant's explanation for its actions. The perverse effects of this doctrine should be plain: District courts are at risk of seeing summary judgments

reversed in all cases except those in which the defense witnesses and all documentary evidence sing in perfect harmony (which itself might, ironically, be cited as evidence of chicanery). Defendants, wary of jury trials and apprehensive of the cost of litigation, and commonly facing an appealing plaintiff and the prospect of a jury, may be inclined to settle even weak cases. Such a regime invites frivolous suits and rulings that defy harmonization.